**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Paul Jessup,<br><br>                Petitioner,<br><br>v.<br><br>Charles Ryan, et al.,<br><br>                Respondents. | No. CV-15-01196-PHX-NVW (JZB)<br><br>**ORDER** |

      Before the Court is the Magistrate Judge's Report and Recommendation on Petitioner's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 46.)

      Arizona effectively abolished parole by repealing the authority of any agency to grant parole for crimes committed after January 1, 1994. 1993 Ariz. Sess. Laws, ch. 255, § 86; *State v. Vera*, 235 Ariz. 571, 575, 334 P.3d 754, 758 (Ct. App. 2014). Petitioner Michael Jessup ("Jessup") pled guilty to first-degree murder and armed robbery committed when he was seventeen years old. When he was sentenced on July 21, 1999, the only lawful sentences in Arizona for first-degree murder, including for a juvenile tried as an adult, were death or life without parole. Jessup's plea agreement allowed a sentence of life without parole but not death. The agreement also purported to allow a sentence with possibility of parole after 25 years, but that provision was a nullity because no authority to grant parole existed. The plea agreement could not validly authorize an illegal sentence of life with possibility of parole. The only legal sentence available under both Arizona law and the plea agreement was life without parole. On July 21, 1999,

Jessup was sentenced to life without parole, after the judge purported to exercise discretion he did not legally have.

In 2012 the United States Supreme Court held mandatory sentences of life without parole for crimes of minors to be categorically unconstitutional. A sentence of life without parole could be imposed after consideration of relevant factors and exercise of discretion in the circumstances. But mandatory life without parole for juveniles is unconstitutional *per se.* Jessup then sought post-conviction relief in the state courts. After exhausting those proceedings, he timely filed a petition for habeas corpus in this Court.

The Magistrate Judge recommended denial of Jessup's petition. The Court will reject that recommendation. The 1993 amendment to the sentencing statute for first-degree murder included three sentencing options: (1) death, (2) natural life (without possibility of parole), and (3) life with possibility of parole after 25 years. 1993 Ariz. Sess. Laws, ch. 153, § 1. But the third option was extinguished in 1994 when Arizona repealed the authority of any agency to grant parole for crimes committed after January 1, 1994. The plea agreement in 1999 included an illusory choice of parole that the law did not allow to be implemented. The term of the plea agreement purporting to allow parole, which there was no authority to implement, could not vest the judge with authority to impose that illegal sentence.

Although the Arizona Legislature has since reinstated parole for juvenile offenders previously illegally sentenced with the possibility of parole, it has not done so for those like Jessup who were sentenced to life without possibility of parole with no legal alternative available to the judge. Consequently, Jessup is serving an unconstitutional mandatory life-without-parole sentence, directly contrary to categorical Supreme Court precedent.

# I. BACKGROUND THROUGH CONVICTION AND SENTENCING

## A. Jessup's Crimes and Plea Agreement

Jessup does not contest the following facts, which are drawn from the presentence report and were relied upon by the state courts.

On February 18, 1998, 79-year-old Frank Watkins was kidnapped at gunpoint. (Doc. 19-1, Ex. I at 94.) He had gone out to the yard of his Mesa, Arizona, home to pick grapefruit. (*Id*.) A heavily intoxicated Jessup and his companion forced Watkins into his own pickup truck. (*Id.* at 94-96.) They stopped to collect another companion, who drove the truck to a remote area several miles from Watkins's home. (*Id.* at 94.) On the way, Jessup took Watkins's personal property. (*Id*.) When the group arrived at the remote location, Jessup made Watkins walk to a drainage ditch. (*Id*.) He then shot him "repeatedly with two pistols at close range, with several bullets entering the head and face of Mr. Watkins." (*Id*.)

Watkins was reported missing that night. (*Id*.) Several hours after the report, the police found his pickup truck in a city park in Tempe, Arizona. (*Id*.) It had been set on fire. (*Id*.) A previously attached camper shell was missing. (*Id*.)

Another vehicle, an Oldsmobile, had been stolen near the park. (*Id*.) Jessup and his two companions were arrested on February 23, 1998, after fleeing from the stolen Oldsmobile. (*Id*.) Workers then found Watkins's body near the drainage ditch. (*Id.* at 95.)

A grand jury indicted Jessup on five counts: (1) first-degree murder, (2) armed robbery, (3) kidnapping, (4) arson of a structure, and (5) theft. (Doc. 19-1, Ex. A.) On February 19, 1999, Jessup entered into a plea agreement to plead guilty to counts 1 and 2. (Doc. 19-1, Ex. I at 101.) The State agreed to dismiss the other counts and not seek the death penalty. (*Id*.) The murder count required a life sentence either "with no possibility of parole (natural life sentence), or . . . with parole eligibility after 25 calendar years of incarceration." (*Id*.) The second option, however, was illegal. For the armed robbery,

the "presumptive sentence" was 10.5 years, the minimum 7, and the maximum 21 under Arizona statute. (*Id.*)

**B.     The Sentencing Hearing**

**1.     Testimony of Psychologist Dr. Daniel Cady**

At Jessup's sentencing hearing on July 21, 1999, psychologist Dr. Daniel Cady, who had evaluated Jessup and prepared a report, testified on his behalf. (Doc. 19-3, Ex. EE at 6, 8.) Cady believed Jessup had been misdiagnosed as bipolar; instead, he had attention deficit hyperactivity disorder, which inhibited his ability to form social relationships with his peers as an adolescent. (*See id.* at 14-18.) When Jessup was 17, with untreated ADHD he likely had an emotional age of 12 to 13. (*See id.* at 14.) Cady did not see Jessup as having "a primary, aggressive, sociopathic personality," and thus he did not think it likely Jessup would reoffend. (*Id.* at 21-22.) Cady did see "a relatively typical juvenile offender who, under conditions of prolonged and extensive substance use, affected some tremendously poor judgment." (*Id.* at 22.) He also believed that Jessup had the ability to appreciate the wrongfulness of his actions, an ability that would "increase as time goes on." (*Id.*)

On cross-examination, Cady acknowledged that Jessup had threatened his sister with a knife and chopped her hair off, that he had a lengthy history of counseling, and that he was "well oriented" when not under the influence of drugs and alcohol. (*Id.* at 25-26.) He also confirmed details from his written report that Jessup appeared to "get off" on discussing illegal or dangerous situations and encouraging others to put themselves in such situations and that he was "[c]ool and indifferent to the rights of others." (*Id.* at 27-28.) Finally, he agreed that it is "extremely difficult" to predict future violent behavior. (*Id.* at 30.)

Cady summarized his conclusions on redirect: "I have seen children with far worse psychological profiles and emotional, mental kinds of difficulties like ADHD, who have made remarkable changes, who have come back to the juvenile court in their early 20s,

employed, children, married, having successful lifestyles where we would have thought they were extremely disturbed children during adolescence." (*Id.* at 33.)

### 2. Sentencing Judge's Findings and Sentence

Sixteen years later, the Arizona Court of Appeals found the sentencing judge had in fact complied with the requirements an intervening Supreme Court case for a juvenile life sentence without parole. The judge's analysis and stated reasons for the sentence are given below.

Jessup's attorney argued mitigating factors. He stressed Jessup's age of 17 at the time of the crime and his emotional age of 12 to 13. (*Id.* at 39.) He noted that Jessup had begun attending Bible study and stated he accepted responsibility. (*Id.* at 39-40.) His counsel said, "I think that Doctor Cady, through his report and his testimony, has indicated safely that this is not a person who is likely to be involved in this type of situation again." (*Id.* at 40.) The State responded that the psychological testimony actually ought to have alarmed the court, as it demonstrated Jessup "has a conduct disorder, a personality disorder. He regularly and repeatedly violates the right of others. He is aggressive. He gets off on doing illegal things." (*Id.* at 41.) Despite counseling, probation, treatment by doctors, and placement in a reform school, Jessup still went out "and did what he did to Frank Watkins." (*Id.* at 42.)

The judge then sentenced Jessup. Though he believed he did not need to go through all of the mitigating and aggravating factors, to his credit he stated his reasons for the sentence. (*Id.* at 46.) The judge, an experienced criminal judge, had a record consisting of the matters later Supreme Court cases said should be given appropriate weight before concluding that a defendant is "the rare juvenile offender whose crime reflects irreparable corruption." *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012). *Miller* "did not impose a formal factfinding requirement," and the sentencing court need not "make a finding of fact regarding a child's incorrigibility." *Montgomery v. Louisiana*, 136 S. Ct. 718, 735 (2016). But the judge's extended comments did not show that disbelieved any of the facts for leniency/parole. He considered the heinousness of the

crime trumps the prospect of rehabilitation, notwithstanding Jessup's chronological age of 17, his emotional age of 12 to 13, his attention deficit hyperactivity disorder, his chronic drug and alcohol addiction, his intoxication at the time of the murder, and his statement of remorse. That comes close, perhaps too close, to saying corrigibility counts for nothing if the crime is too heinous.

The sentencing judge stated that he read and considered the presentence report and attachments, including letters from Watkins's family and Cady's report and testimony. (*Id.* at 37.) He considered the mitigating factor of Jessup's age and other factors but did not say that he gave them any weight or what weight. (*Id.* at 43.) He dismissed Jessup's intoxication when he committed the murder as a culpability factor: "I have also considered as a mitigating factor, although in a way I could also consider it as an aggravating factor, that you were on several drugs at the time of the murder." (*Id.*) He conceded that Jessup had no history of violent crimes. (*Id.* at 46.)

The sentencing judge noted that Jessup's dad and stepmom had "done virtually everything that a parent could possibly do" to get Jessup on the right path. (*Id.* at 43-44.) Other aggravating circumstances included the cruelty inflicted on Watkins by forcing him to contemplate his fate during the 30-minute drive, though the only threat appearing in the record was the implicit threat from brandishing firearms. (*Id.* at 44.) Also included were Watkins's age and concomitant helplessness, the gratuitousness of the multiple gunshots, the motive of pecuniary gain, the fact that Jessup was "clearly the most culpable" of the three perpetrators, Jessup's criminal history, and the harm inflicted on Watkins's family. (*Id.* at 44-47.) He discounted Jessup's recent expressions of remorse because "frankly there was no remorse right after the crime or in jail soon after." (*Id.* at 44.)

Given the chance, the judge would have considered the death penalty, which the plea agreement forbade. (*Id.* at 47.) He instead imposed a sentence of life in prison without parole:

> You caused the loss of a husband, a father, a grandfather, a brother, an uncle, of a very decent man, and crimes such as this where somebody actually gets kidnapped in front of their home at gunpoint and murdered, those types of crimes simply shock the conscience of the community.
>
> And you know, you took the life of, what appears to me, somebody who all of us would like to know, a decent, nice good man who appeared to have lived his entire life for his family, for his friends and someone who we can all admire.
>
> And you know, frankly, Mr. Jessup, we talked about this at the time of the settlement conference, but for your plea agreement and the wishes of Mr. Watkins' family, you may have had a really good chance of being sentenced to death by me.
>
> But when my choice is between a chance that you will be paroled -- and I know what happens 25 years down the line. What happens is, that every one of the members of the family who opts in will get a letter from the Department of Corrections, from the Board of Executive Clemency, and each year they will receive that same letter, and each year they will go through the pain of having to think about Mr. Watkins' death and the manner that it was committed.
>
> So when my choice is between a chance that you will be paroled and certainty of knowing that you will be in prison for the rest of your life, the choice becomes clear to me. I really do believe that you forfeited your right to walk as a free member of society, again, because of the heinousness of the crimes and cruelty that you imposed on Mr. Watkins.

(*Id.* at 47-48.)

In sum, though the Supreme Court did not, after the fact, require the judge to have given findings of fact and his reasons for sentence, the judge here did. Those reasons are all culpability reasons without rejection or discount of any of the leniency/corrigibility reasons, other than Jessup's remorse because it was not expressed early on.

For the armed robbery, the judge also imposed a sentence of 18 years, near the high end of the 7 to 21 year range, and well above the 10.5 year presumptive sentence, "to run consecutive to the murder sentence." (*Id.* at 48.)

## II. POST-CONVICTION RELIEF PROCEEDINGS

### A. State Court Proceedings

On June 20, 2013, Jessup filed a Notice of Post-Conviction Relief. (Doc. 19-1, Ex. P.) He contended that the Supreme Court's June 25, 2012 decision in *Miller v. Alabama*, 567 U.S. 460 (2012), constituted a significant change in law that would

overturn his sentence for murder. *See* Ariz. R. Crim. P. 32.1(g) (one ground for relief is "a significant change in the law that, if applied to the defendant's case, would probably overturn the defendant's conviction or sentence").

In *Miller*, the Supreme Court held "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments." 567 U.S. at 465 (internal quotation marks omitted). In distilling the "foundational principle" from its precedents, the Court explained that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at 474. The Court was concerned "about children's diminished culpability and heightened capacity for change . . . ." *Id.* at 479. The Court commented on the "great difficulty . . . of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 479-80 (internal quotation marks omitted). The Court did not foreclose sentences to life in prison without parole. It barred mandatory life sentences without parole and required the judge "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

The Court did not provide specific factors for the sentencing judge to consider. Instead, it noted that a mandatory life-without-parole scheme *precludes* the judge from considering things such as (1) "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment"; (3) "the circumstances of the homicide offense, including the extent of [ ] participation and the way familial and peer pressures may have affected" the defendant; (4) "incompetencies associated with youth—for example, [ ] inability to deal with police officers or prosecutors (including on a plea agreement) or [ ] incapacity to assist" one's own attorney; and (5) "the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

The state superior court denied Jessup post-conviction relief. It stated that "*Miller* does not place a categorical ban on juvenile life without parole." (Doc. 19-1, Ex. Q at 153.) Instead, "the judge or jury must have the opportunity to consider mitigating circumstances such as the age of the defendant at the time of the offense prior to imposing the harshest sentence possible for a juvenile." (*Id.* at 153-54.) In Jessup's case, under the meaningless term of the plea agreement purporting to allow parole in this mandatory life sentence, the court weighed his age as a mitigating factor against a number of aggravating factors and gave a life sentence without parole. (*Id.* at 154.) Consequently, the superior court held that *Miller* was not "a significant change in law" as applied to Jessup's case. (*Id.*)

Jessup moved for reconsideration (Doc. 19-1, Ex. R.), which the superior court denied on July 30, 2013 (Doc. 19-2, Ex. U). It assumed without deciding that *Miller* applied retroactively. (*Id.* at 66.) The court noted that *Miller* did not foreclose a life sentence but instead "mandated that mitigating factors such as age" be considered before imposing such a sentence. (*Id.*) "The record in this matter is clear that the sentencing judge took into account the age of the defendant as part of the sentencing determination. Therefore, if *Miller* has retroactive application, its requirements regarding mitigation have been met . . . ." (*Id.* (internal citation omitted).)

Jessup appealed. (Doc. 19-2, Ex. V.) On April 9, 2015, the Arizona Court of Appeals granted review but denied relief. (Doc. 19-2, Ex. Z at 162.) It explained:

> Assuming, *arguendo*, that *Miller* applies retroactively, Jessup has not shown entitlement to relief. *Miller* prohibits *mandatory* life sentences without the possibility of parole for juvenile offenders. Jessup's sentence to natural life was not mandatory. The superior court noted at sentencing that it had the option to sentence Jessup either to natural life or life with a possibility of release after 25 years' imprisonment. In considering the appropriate sentence, the superior court found Jessup's age to be one of several mitigating factors. The court also heard from a psychologist regarding his presentence evaluation of Jessup as a juvenile offender. Among other opinions, the psychologist did not believe Jessup's aggressive activity would extend into adulthood and his appreciation of the wrongfulness of his acts would increase with age. The psychologist further noted that adolescents do not have the same kind of judgment as adults. In short, the

> superior court considered "how children are different" and Jessup's sentence to natural life complied with *Miller*.

(*Id.* at 161 (internal citations omitted) (emphasis in original).)

Jessup petitioned for review in the Arizona Supreme Court (Doc. 19-2, Ex. AA), which summarily denied the petition on October 27, 2015 (Doc. 19-2, Ex. CC).

### B. This Habeas Petition and Intervening Supreme Court Law

On June 29, 2015, Jessup filed this Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus for violation of *Miller*. (Doc. 1.)

On January 25, 2016, the United States Supreme Court held that its ruling in *Miller* was substantive and retroactive. *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016). "*Miller*, then, did more than require a sentencer to consider a juvenile's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth." *Id.* at 734 (internal quotation marks omitted). Thus, even "if a court considers a child's age before sentencing him . . . to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." *Id.* (internal quotation marks omitted). A "State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.* at 736.

## III. ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, governs petitions by state prisoners for habeas corpus. Relief under AEDPA requires a timely petition and exhaustion of state-court post-conviction remedies. Relief can be granted only if the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a

decision of this Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

In most habeas cases "the federal court should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale" and should "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Because the Arizona Supreme Court disposed of Jessup's post-conviction relief with a summary order, this Court looks to the reasoning of the Arizona Court of Appeals.

### A. Jessup's habeas petition is timely.

A habeas petitioner must file his petition within one year from "the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively available to cases on collateral review." 28 U.S.C. § 2244(d)(1)(C). "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." *Id.* § 2244(d)(2).

The Supreme Court decided *Miller* on June 25, 2012. Jessup filed his state-court post-conviction relief petition on June 20, 2013. (Doc. 19-1, Ex. P.) That filing was within one year and tolled the period, under § 2244(d)(2), to file a federal habeas petition until after the state-court petition was concluded. Further, Jessup filed this federal habeas petition on June 25, 2015, before the Arizona Supreme Court denied review (and ended the tolling period) on October 27, 2015. (Doc. 19-2, Ex. CC.) Jessup's habeas petition is timely.

### B. Jessup exhausted his state-court post-conviction remedies.

A habeas petitioner in state custody normally must exhaust any available state-court post-conviction remedies. 28 U.S.C. § 2254(b)(1). The state must have "the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted). "To

- 11 -

provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.*

All aspects of Jessup's *Miller* claim were fairly presented to the Arizona courts. His petition relied entirely on *Miller*. (Doc. 19-1, Ex. P at 151.) The parties do not dispute that the state courts decided Jessup's post-conviction relief petition based on whether the sentencing judge complied with *Miller*, a substantive decision based on the merits of a federal constitutional question. The Arizona Court of Appeals was expressly presented with the problem of the option of sentencing to parole that could not be legally implemented. (Doc. 19-2, Ex. X at 117.) The Arizona Supreme Court summarily denied review. (Doc. 19-2, Ex. CC.) Jessup properly exhausted his state-court remedies.

### C. Jessup's mandatory life sentence without possibility of parole is directly contrary to *Miller's* categorical prohibition of such sentences.

Because Arizona had no parole that could be implemented since 1994 and the plea agreement required a life sentence, Jessup was sentenced to a mandatory life sentence without *actual* possibility of parole for a crime he committed while he was under 18. The sentencing judge had no other choice, though the plea agreement misled him into thinking he did. *Miller* requires an actual choice to deny parole and real exercise of that discretion. Jessup's sentence and the decision of the Arizona Court of Appeals directly conflict with the categorical rule of *Miller* that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments." 567 U.S. at 465 (internal quotation marks omitted).

Despite the sentencing judge thinking he had a choice of parole or no parole, Arizona law gave him no choice. The State of Arizona had abolished parole for crimes committed after January 1, 1994. 1993 Ariz. Sess. Laws, ch. 255, § 86; *State v. Vera*, 235 Ariz. 571, 575, 334 P.3d 754, 758 (Ct. App. 2014). The abolition was done in two steps. First, the authority of the Board of Executive Clemency to grant paroles was abolished for crimes after January 1, 1994. Second, a system of earned release credit was

enacted in its place. The system of earned release credits cannot be applied to a life sentence. *See Vera*, 235 Ariz. at 575, 334 P.3d at 758. The Board's authority for parole remained for sentences and crimes before January 1, 1994. Though sentencing statutes remained on the books, including parole for some crimes, that was necessary for crimes committed before January 1, 1994, and prosecuted after. The Arizona Court of Appeals did not recognize that the sentencing judge's choice of parole was empty because there was no authority to implement parole for Jessup's crime. Therefore, the life sentence without parole was mandatory. The ruling is "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The State contends it no longer matters that Jessup's life sentence was required to be without parole because the Arizona Legislature "reinstated parole for all juveniles sentenced to life with a possibility of release after a term of years in 2014." (Doc. 49 at 4 n.1.) The Magistrate Judge's Report and Recommendation said the same. (Doc. 46 at 9 n.2.) But the 2014 statute to which the State and the Magistrate Judge point says:

> Notwithstanding any other law, a person who is sentenced to life imprisonment *with the possibility of release* after serving a minimum number of calendar years for an offense that was committed before the person attained eighteen years of age is eligible for parole on completion of service of the minimum sentence, regardless of whether the offense was committed on or after January 1, 1994.

A.R.S. § 13-716 (emphasis added). This partially curative statute validated the possibility of parole for those juveniles whose sentences illegally purported to allow parole. But the statute did nothing to cure the federal unconstitutionality of juvenile life sentences that in reality were mandatorily without parole, even though the sentencing judge mistakenly thought he could sentence to parole and expressed his agreement with the mandatory life sentence without possibility of parole.

The partially curative statute thus does not help Jessup. He was not "sentenced to life imprisonment with the possibility of release." He was sentenced to life *without* the possibility of release. Parole was not legal when he was sentenced, and he is still ineligible for parole because the 2014 statute does not apply to him. Cases like *Vera*, where the Arizona Court of Appeals found A.R.S. § 13-716 remedied an assumed *Miller*

violation, dealt with sentences such as "life without parole for twenty-five (25) years." 235 Ariz. at 572, 334 P.3d at 755. *See also State v. Randles*, 235 Ariz. 547, 548-49, 334 P.3d 730, 731-32 (Ct. App. 2014) ("The trial court sentenced Randles to life in prison without the possibility of parole until he served a minimum term of 25 years.").

Some legislators were aware that A.R.S. § 13-716 cured only some but not all *Miller* violations for juveniles in Arizona. One proposed bill would have added this new section: "Notwithstanding any other law, a person who is sentenced to serve a term of imprisonment, including consecutive sentences, of at least twenty-five calendar years for an offense that was committed before the person attained eighteen years of age is eligible for parole on completion of service of twenty-five calendar years." H.B. 2193, 53d Leg., 2d Sess. (Ariz. 2018). That bill did not pass. It would have given Jessup a right to a parole hearing not purportedly given at his sentencing and that could not have been legally given. Under current Arizona law, however, Jessup still has no route to parole. *See also State v. Valencia*, 241 Ariz. 206, 210, 386 P.3d 392, 396 (2016) (noting that the need for resentencing "could be obviated . . . by the legislature amending A.R.S. § 13-716 to apply to inmates serving natural life sentences [sentences without parole] for murders committed as juveniles").

The State argues that the prospect of executive clemency satisfies *Miller*: "*Miller* precluded only mandatory life sentences; it said nothing about executive grants of clemency versus parole." (Doc. 49 at 4.) The State's interpretation would render *Miller* meaningless. Probably all juvenile sentences in violation of *Miller* would not be in violation of Miller because likely every state has some form of executive clemency, however rare its exercise. In Arizona, the governor can grant clemency only if the Board of Executive Clemency first recommends the petition to the governor. A.R.S. § 31-402(A). In stating its express holding, the *Miller* Court said "parole," not "clemency." 567 U.S. at 465. And in *Graham v. Florida*, 560 U.S. 48, 69-70 (2010), a case foundational to the *Miller* holding, the Court remarked, "The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a

- 14 -

forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence."

Moreover, the State makes this argument in disregard of its own sentencing statute. Before 1993, the statute allowed only two sentences for first-degree murder: "death or life imprisonment in the custody of the State department of corrections for life, without possibility of release on any basis until the completion of the service of twenty-five calendar years . . . ." 1988 Ariz. Sess. Laws, ch. 155, § 1. In 1993, the Arizona Legislature amended the sentencing statute to add a third possible sentence: "natural life"—i.e., life without possibility of parole or any release. Indeed, the new statute provided, "An order sentencing the defendant to natural life is not subject to commutation or parole, work furlough or work release." 1993 Ariz. Sess. Laws, ch. 153, § 1. The current statute still does not provide for release, including clemency, for those sentenced to natural life, as Jessup was. A.R.S. § 13-751(A)(2) (2018); (Doc. 19, Ex. J at 118). So much for executive clemency as an escape from Arizona's *Miller* violations.

Although *Montgomery* contemplated a parole hearing as a proper remedy for a *Miller* violation, 136 S. Ct. at 736, no Arizona statute permits a parole hearing for Jessup. Resentencing is the only remedy available for the violation of his constitutional right.

Because the initial sentence included two counts of conviction arising from the same conduct—first-degree murder and armed robbery—the resentencing must address both counts. No one can know the extent to which the sentencing judge considered the sentence for one count in deciding the sentence for the other. Unless dealing only with mandatory minimum sentences and sentencing only to the minimums, judges can and should consider the total sentence when sentencing on multiple counts. Indeed, a judge can reduce the sentence he otherwise would impose for one count in light of an additional mandatory minimum sentence to be imposed for another count. *Cf. Dean v. United States*, 137 S. Ct. 1170, 1177 (2017).

The question considered by the Arizona Court of Appeals was whether the sentencing judge could have considered and did adequately consider the *Miller* factors before *Miller* was decided. The Ninth Circuit has held it is possible to have adequately considered the *Miller* factors before *Miller* became the law. In *Bell v. Uribe*, 748 F.3d 857, 860 (9th Cir. 2014), the Circuit noted that the petitioner was sentenced in 2005, before *Miller* was decided in 2012. But because "the sentencing judge did consider both mitigating and aggravating factors *under a sentencing scheme that affords discretion and leniency*, there is no violation of *Miller*." *Id.* at 870 (emphasis added). A life sentence without parole was not mandatory in *Bell*.

The Arizona Court of Appeals's discussion of how the sentencing judge actually undertook a *Miller* analysis in his sentencing remarks is of no consequence. The sentencing judge had no authority to make such a choice. The illegal term of the plea agreement could not vest him with power to give a life sentence with parole that is unenforceable. The sentencing judge's remarks had no more effect for *Miller* purposes than a scholar's comments would have, for the same reason. Neither a scholar nor the judge in this case had legal authority to give a sentence of life with possibility of parole. That authority and its exercise are the lynchpin of satisfying *Miller*, either *ex post* or *in futuro*. The Arizona Court of Appeals's holding that the empty exercise of non-existent discretion satisfied *Miller* is at best "an unreasonable application of" *Miller*. 28 U.S.C. § 2254(d)(1). When stripped of verbiage down to substance, it is also directly "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States." *Id*.

Jessup's case is entirely different from pre-*Miller* sentences in courts that had authority to sentence to life with or without parole and coincidentally touched on the necessary factors, as later enlightened by *Miller* and *Montgomery*, in sentencing to life without parole. From 1994 to 2014, Arizona had a regime of mandatory life sentences without parole. The life-with-parole sentence formally on the books for first-degree murder was a nullity because of the 1994 abolition of any agency's power to grant parole

for crimes committed after January 1, 1994. For juveniles, that is a categorical violation of *Miller*, so Jessup and all other juveniles then sentenced to life without parole are entitled to resentencing, or a parole hearing if new state legislation permits it.

This case is about whether a sentencing judge could absolve an unconstitutional mandatory life sentence without parole from its unconstitutionality by expressing his *obiter dictum* that he agreed with the mandatory sentence, with which he had no authority under state law to disagree. The Supreme Court's categorical pronouncement of constitutional right of juveniles is not so easily reduced to a word game.

**D.     Postscript**

This case presents another serious question of whether the sentencing judge's comments and process satisfied the requirements of a *Miller*-compliant life sentence without parole. The state courts held they did. That may be an "unreasonable application of" *Miller* remediable on federal habeas corpus.

To be sure, *Miller* does not require findings of fact and statement of reasons for the sentence to show that the judge did not sentence the juvenile to life without parole in violation of the *Miller* requirement that only the incorrigible are so sentenced. But in this case the judge did state his findings and reasons. The state courts thought it enough that the judge considered the age and corrigibility factors without analysis of the actual reasons stated for the sentence. A simple thought experiment will show that could still violate *Miller*. Suppose a judge, after considering all the relevant factors, delivered reasons for life without parole that substantively defy *Miller*. Suppose the judge found incorrigibility factors unimportant, though weighty on their own, in light of the overriding need for punishment and deterrence. Surely that would violate *Miller*.

In this case the sentencing judge's exhaustive comments on the reasons for sentence addressed only the heinousness of the crime and the harm to the victim and his family. He said nothing about the prospect for rehabilitation with growth, maturity, and treatment. He even stated as a reason to deny parole that the victim's family would be re-traumatized by the parole hearing process. There is an especially serious question

- 17 -

whether parole can be denied for juveniles because the otherwise-constitutionally-required parole hearing process itself weighs against parole.

This Court does not reach those questions. The grounds for relief stated herein are sufficient.

IT IS THEREFORE ORDERED that the Report and Recommendation (Doc. 46) is rejected.

IT IS FURTHER ORDERED that Petitioner Michael Paul Jessup's Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody (Non-Death Penalty) (Doc. 1) is granted.

IT IS FURTHER ORDERED that the Clerk of the Court enter judgment in favor of Petitioner Michael Paul Jessup against Respondents granting his Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 and ordering that Petitioner be resentenced within 120 days on both counts of conviction.

The Clerk shall terminate this case.

Dated this 28th day of August, 2018.

_____
Neil V. Wake
Senior United States District Judge